### UNITED STATES v. GREAT LAKES TOWING CO. et al.

(District Court, N. D. Ohio, E. D. June 15, 1914.)

No. 8003 (72).

1. MONOPOLIES (§ 26*)—ANTI-TRUST ACT—UNLAWFUL COMBINATIONS—EQUITABLE REMEDY.

The Sherman Anti-Trust Act July 2, 1890 (26 Stat. 209, c. 647 [U. S. Comp. St. 1913, § 8820 et seq.]), section 4 of which alone relates to an equitable remedy for its violation, contains in terms no provision for equitable relief to the public, except by way of injunction or prohibition; and while the power to dissolve an unlawful combination clearly exists, and should be exercised when necessary to give complete relief, the legislative policy as disclosed by the terms of the act is clearly to resort to restraint rather than to dissolution, except where restraint alone is inadequate. The means to be employed to put an end to such a combination are governed by no uniform rule, but depend upon the facts of the particular case; and even where dissolution seems to be required to the furnishing of complete relief, such requirement does not necessarily amount to more than that the combination be dissolved so far as unlawful.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 26.*]

2. MONOPOLIES (§ 26*)—ANTI-TRUST ACT—SUIT AGAINST UNLAWFUL COMBINATION—RECEIVERSHIP.

While a receivership is proper, when necessary to effect the dissolution of a combination which is unlawful, as in violation of the Anti-Trust Act, it is not always necessary, even in such case, and when it is not it should not be resorted to.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 26.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

3. Monopolies (§ 26*)—Anti-Trust Act—Suit to Restrain Unlawful Combination—Nature of Relief.

A towing company, which through purchases of the stock of other competing companies and the vessels of still other owners, acquired a large percentage of the tugs operating on the Great Lakes, was adjudged to have created a monopoly, in violation of the Anti-Trust Act by using unfair means to prevent competitors from doing business anywhere on the Lakes. *Held*, that the violation of the law did not consist in the ownership of the stock and vessels so acquired, but in the illegal method of doing business; that the remedy which would be most beneficial to the public was not a dissolution of the company through a receivership and sale of its vessels to a number of separate and independent purchasers, but a decree permitting it to continue business under proper and stringent injunctive regulations, which would eliminate the illegal practices and keep the way open for full and free competition.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 17; Dec. Dig. § 26.*]

In Equity. Suit by the United States against the Great Lakes Towing Company and others. On settlement of decree for complainant.

U. G. Denman, U. S. Atty., of Cleveland, Ohio, and E. P. Chamberlin, Sp. Asst. U. S. Atty., of Bellefontaine, Ohio.

Goulder, Day, White & Garry and Hoyt, Dustin, Kelley, McKeehan & Andrews, all of Cleveland, Ohio (Harvey D. Goulder and Hermon A. Kelley, both of Cleveland, Ohio, of counsel), for defendants.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

PER CURIAM. We reached the conclusion, upon final hearing, that the defendant Great Lakes Towing Company and the corporations which it controls constitute a combination in violation of the Anti-Trust Act. 208 Fed. 733, 746.

The towing company was given opportunity to present, if it could, a feasible and satisfactory plan whereby the offending administrative practices mentioned in our opinion should be eliminated, and by which the towing company's services should be given for the equal benefit of all vessel owners needing its facilities, and the rights of competitors be completely safeguarded, in which case, we said, the injunction need only forbid continued operation except in compliance with the terms of such plan. Otherwise, the parties were to be heard upon a plan of dissolution, with form of decree for injunction, and for receivership, if necessary, to effect dissolution. The towing company thereupon presented a plan which it was urged would conform to the suggestion of the court. The government not only made specific criticisms upon various features of the suggested plan, but insisted that the combination could be effectively terminated only through a sale of the physical properties of the towing company, under direction of the court, through a receivership by which the company should be operated pending sale.

We indicated, by memorandum filed, that neither of the proposed plans was satisfactory, at least without important modifications, and gave opportunity for the presentation of further plans, both by the

government and the towing company, submitting also certain questions on which we asked the views of counsel. The towing company still confines its suggestions substantially to the general plan first presented by it, and has offered no plan of dissolution. The government suggests no plan, except dissolution by way of sale of the towing company's assets, urging that as the only remedy, and to be effected only through receivership (in the absence of the towing company's consent to a plan of dissolution), modifying its former position only by suggesting that the plan provide for the distribution of the property and business of the towing company among such number of separate, distinct corporations, of divergent ownership, as may be necessary to restore competitive conditions.

[1] The Anti-Trust Act contains in terms no provision for equitable relief to the public on account of violations of the act, except by way of injunction or prohibition. Section 4, which alone relates to the equitable remedy, invests the appropriate courts with "jurisdiction to prevent and restrain violations of this act." It is made the duty of the district attorneys, under the direction of the Attorney General, to "institute proceedings in equity to prevent and restrain such violations." The prescribed prayer of the petition is that "such violations shall be enjoined or otherwise prohibited," and provision is made for "such temporary restraining order or prohibition as shall be deemed just in the premises." While the power to dissolve an unlawful combination clearly exists, and should be exercised when necessary to give complete relief, the legislative policy, as disclosed by the terms of the act, is clearly to resort to restraint rather than to dissolution, except where restraint alone is inadequate.

In United States v. Freight Association, 166 U. S. at page 343, 17 Sup. Ct. 560, 41 L. Ed. 1007, injunction is spoken of as "more efficient than any other civil remedy." In the Reading Case, 226 U. S. 324, 33 Sup. Ct. 90, 57 L. Ed. 243, the only relief given, aside from cancellation of the 65 per cent. contracts, was injunctive. In Sanitary Mfg. Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. 107, none but injunctive relief seems to have been given. Moreover, where dissolution of an offending combination seems to be required to the furnishing of complete relief, such requirement does not necessarily amount to more than that the combination be dissolved so far as unlawful; in other words, that the features which make it unlawful be eliminated by whatever means may be necessary therefor. For example:

In the Northern Securities Case, 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679, dissolution was accomplished by requiring such Securities Company to largely reduce its own stock, and in lieu of the stock so retired to distribute to its own stockholders a proportionate amount of the competitive stocks held by it. In the Standard Oil Case, 223 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734, the New Jersey corporation, which held the stocks of a large number of other corporations in exchange for its own, was required to distribute the stock so held among its own stockholders. In the Tobacco Case, 221 U. S. 106, 31 Sup. Ct.

632, 55 L. Ed. 663, the business was divided between four corporations; the controlling companies being again so subdivided that business control was in the hands of a large number of separate corporations. Certain stock distributions were made, and injunctive relief given. In the Union Pacific Case, 226 U. S. 470, 33 Sup. Ct. 162, 57 L. Ed. 306, dissolution was effected by the sale of the Southern Pacific stock. In the Reading Case, the unlawful combination was held to exist as to the Temple Iron Company and the 65 per cent. contracts; and defendants were enjoined from voting the stock of the iron company, the contracts referred to were canceled, and their further execution enjoined. In the St. Louis Terminal Case, 224 U. S. 383, 32 Sup. Ct. 507, 56 L. Ed. 810, the unlawful condition was relieved against by such revamping of the conditions as that all the railroad companies could get the benefit of the terminal facilities on equal terms.

It is thus seen that, even where the remedy by injunction is thought to be inadequate, there is no uniform rule respecting the means to be employed in putting an end to the unlawful combination. Each case must stand upon its own facts; and methods adopted in other cases are not necessarily to be followed as precedents, except where the same situation is presented. Union Pacific Case, 226 U. S. 470, 474, 33 Sup. Ct. 162, 57 L. Ed. 306.

[2] While receivership is clearly proper when necessary to effectuate dissolution (Union Pacific Case, supra; St. Louis Terminal Case, supra), it is not always necessary even in such case, and should not be resorted to except where necessary. In none of the anti-trust cases to which we have referred does there appear to have been actual receivership. The nearest approach to it is in the Union Pacific Case, where a trustee was appointed to hold and transfer the stocks required to be disposed of.

The controlling inquiry thus is: What remedy promises the most effective measure of relief against the evils which we have found to exist?

[3] In the instant case, the evil to be remedied is not the ownership by the towing company of the corporate stocks of the Dunham and the Union Companies, the Thompson Towing & Wrecking Association, the Hand & Johnson Tug Line, and the Great Lakes Towing Company, Limited. These companies were not substantial competitors. No good would result from distributing to the stockholders of the towing company the stocks of the five companies above enumerated; and the government does not so request. Nor does the evil reside in the mere ownership of the corporate stocks, or physical properties, or both, bought from the other corporations or individuals. It is concededly impossible to restore to the sellers the properties so bought. The combination represented by the towing company violates the Sherman Act because it is a monopoly created by abnormal and unfair means, the most important of which are (a) the system of exclusive contracts by which vessel owners who employ throughout the entire season the towing company's tug and wrecking service, at all the ports covered by its tariffs (so far as the vessel owner had occa-

sion for such service), receive a large discount from tariff rates, which is denied to all others; (b) the giving of special concessions, rebates, and discriminations to customers; (c) the restraint of competition by means of operating contracts, by unnecessary conditions imposed upon sellers of towing properties to buyers of tugs from the towing company; and (d) unfair rate wars, all adopted or engaged in for the purpose of obtaining and effectuating monopolistic control. Unless for such means, purposes, and practices, the size alone of the combination, or the mere unification of the towing interests thereby brought about, would surely not justify putting the towing company entirely out of business.

Merely enjoining further operation by the towing company would injure, rather than benefit, the public by depriving it of the present service pending the reorganization of a new and sufficient service. A receivership, and operation thereunder, until competitive conditions should be restored, without utilizing the towing company's property, would amount to a partial and unnecessary confiscation. We are thus left practically to a choice of two remedies: First, selling the towing company's properties to purchasers dissociated from the officers, directors, and stockholders of the towing company, with the expectation that operations will be carried on under a number of separate and independent ownerships, each confined to a given port or group of ports, and by receivership insuring a continuance of service pending sale and the ability to deliver the towing company's properties upon sale; or, second, to permit continued operation by the towing company only upon complete elimination of the offensive practices under which its monopoly has been created and maintained, and the imposition of such injunctive restrictions as will keep the way open for full and free competition. The towing company is before the court and subject to its injunctive processes, including punishment for disobedience thereto; and if we can impose upon that company prohibitions, susceptible of enforcement, which shall eliminate past abuses and remove obstacles to free competition, such course would provide the most effective relief available, and so would manifestly be for the public interest.

We do not overlook the government's contention that a corporation which has, by improper practices, created a monopoly, will, if left in control, find means through indirect and secret methods to evade any injunctive restrictions which may be imposed. We also appreciate that the towing company's present occupancy of the field places all prospective competitors at such disadvantage as in considerable measure to deter them from entering into competition. Nor do we fail to appreciate the insistence that this court cannot effectively superintend the conduct of the defendant's business. Indeed, in our former opinion we said that, for reasons there stated, it then seemed to us unlikely that a decree merely enjoining administrative practices would give complete relief, in the absence of radical change in the fundamental principles upon which the towing company was organized and operated, one of which reasons was the fact that a decree command-

ing cessation of purely administrative practices would not be self-executing.

In spite, however, of these difficulties, we are convinced, after mature consideration, that continued operation by the towing company under proper and stringent injunctive regulations will, if obedience to such regulations can be adequately enforced through punishment for contempt, give better assurance of free competition and better public service than is promised by a division of the towing company's properties among several new ownerships. In reaching this conclusion, we take into account the unsatisfactory history of the towing business previous to the organization of the Great Lakes Towing Company, the fair possibility of a recurrence of those conditions if the parties interested in the towing company's business are wholly excluded from the field and the new organizations released from all restraint by means of our decree, and the possibility of a renewal of the present monopoly through the reacquisition of the interests in the new organizations by those now interested in the towing company (which again would be released from the restraint of our decree), and the fact that under the plan we propose to adopt we shall have, if such plan can be enforced, the effect of 14 separate organizations, so far as concerns opportunities for competition and the avoidance of discriminations, and under the continued control of this court.

The plan we have adopted, not only includes the limitation contained in the plan presented by the towing company, but in the extent and stringency of its provisions goes far beyond that plan. For example: The so-called "exclusive contracts" are forbidden, not only as affecting more than one port, but as applied to even one port; and such restrictions, as well as the towing company's tariffs, are made to apply to all classes of service given by that company. Stringent provisions against unfair rate cutting are also contained, and the provision against discriminations is practically unlimited. Again, we have sought to impose the general prohibitions contained in the Sherman Act, so far as applicable, as well as to apply the rules of the Interstate Commerce Act (Act Feb. 4, 1887, c. 104, 24 Stat. 379 [U. S. Comp. St. 1913, § 8563 et seq.]) as far as seems possible unless Congress shall include within the terms of that act corporations of the class of the towing company.

We see no reason to doubt that under the decree as drafted obedience to the injunctive process can be enforced, and disobedience thereto punished, without serious difficulty, for operation is expressly forbidden, except in strict compliance with the terms of the decree. Receivership and sale will, however, be resorted to in the event that the towing company shall not consent to be bound by the plan embodied in our decree.

The decree will be filed contemporaneously with this opinion, and notice thereof given by the clerk to counsel for all parties. It will not be entered until further order, nor until after the expiration of the time given the towing company to file the consent provided for by the sixth paragraph of the decree.

Injunction is not by the decree filed herewith made to run against the Great Lakes Towing Company, Limited, because, perhaps by inadvertence, that company appears not to have been made a defendant. Opportunity should be given to bring it in, if desired.