### UNITED STATES v. LAKE SHORE & M. S. RY. CO. et al.

(District Court, S. D. Ohio, E. D. May 19, 1916.)

No. 1584.

1. **Monopolies ⬳26(1)—Jurisdiction retained by decree, to make further orders and decrees, held to continue until combination completely dissolved.**

   The jurisdiction retained by a decree ordering the dissolution of an alleged combination and monopoly, to make such further orders and decrees as might be necessary, *held* to continue until the combination and monopoly was completely dissolved, at least to the extent of authorizing an order requiring the sale of stocks and bonds in other companies owned by one of the defendants.

2. **Railroads ⬳169—Discretion of pledgee of stocks and bonds as to release held not arbitrary or unreasonable.**

   Where a trustee under a mortgage given by a railway company and a coal and railway company in which it owned stock was given power to release stocks and bonds pledged as additional security on the pledgor's request, whatever discretion it had in that respect was not one of an unreasonable or arbitrary character.

3. **Monopolies ⬳26(2)—Provision of instrument for sale of stocks and bonds by trustee, as directed by stockholder for corporation owning them, held illegal.**

   Where the sale of stocks and bonds of other companies owned by a railroad company was necessary to complete dissolution of an illegal combination and monopoly, and such bonds and stocks were assigned, subject to liens, in trust for specified purposes, a provision that the trustee should dispose of the equity therein as directed in writing by the persons or corporations owning a majority of the railroad company's stock *held* illegal.

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**4. Monopolies ⬥26(2)—Stocks and bonds of other companies may be ordered sold, free from lien of mortgage, to dissolve combination.**

Where the sale of stocks and bonds of other companies owned by a railroad company was necessary to complete dissolution of an illegal combination and monopoly, and they had been pledged to the trustee under a mortgage as additional security, the court had power to compel a sale free from the lien of the mortgage, and to substitute the proceeds therefor.

In Equity. Suit by the United States against the Lake Shore & Michigan Southern Railway Company and others. On petition by the United States to enforce a sale of the interests of certain defendants in the capital stock and bonds of other companies. Ordered as stated in the opinion.

See, also, 203 Fed. 295.

Stuart R. Bolin, U. S. Atty., of Columbus, Ohio, and John L. Lott, Sp. Asst. Atty. Gen., for the United States.

Lawrence Maxwell, of Cincinnati, Ohio, and John F. Wilson, of Columbus, Ohio, for Hocking Valley Ry. Co.

John H. Doyle and Charles T. Lewis, both of Toledo, Ohio, for Toledo & O. C. Ry. Co.

Arthur H. Van Brunt, of New York City, and Augustus T. Seymour, of Columbus, Ohio, for Central Trust Co. of New York.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

PER CURIAM. (1) July 26, 1915, the Hocking Valley Railway Company and the Chesapeake & Ohio Railway Company, defendants herein, filed a report that they were about to enter into a contract, subject to the approval of this court, for the sale of 2,500 shares of the capital stock of the Buckeye Coal & Railway Company and 2,006 shares of the capital stock of the Ohio Land & Railway Company (being the entire issued capital stock of each coal company); that the proposed contract of sale provided for the exchange of $1,337,-000, face value, of the 20-year purchase-money bonds of the Ohio Land & Railway Company, bearing interest at 6 per cent. per annum and maturing January 1, 1914, for $700,000, face value, of income mortgage bonds of a corporation to be organized and to be designated the Hocking Coal Lands Company.

After hearing all parties concerned upon a motion to confirm such proposed sale, the motion was denied for reasons stated in an opinion of July 30, 1915, disapproving of the contract, unless certain stated modifications were made of some of its provisions. These modifications have not been made, and such stocks and bonds remain unsold or otherwise disposed of. The certificates representing these stocks, except such as were necessary to qualify directors of the respective companies, were placed in the name of the Central Trust Company of New York, as trustee, and such certificates, together with the bonds before mentioned, are held in pledge by such trust company as additional security for payment of the bonds issued under the first consoli-

dated ($20,000,000) mortgage of March 1, 1899 (in evidence in this suit), given by the Hocking Valley and the Buckeye Coal & Railway Company to such trust company as trustee, and the stocks mentioned, subject to the lien stated, are also held by such trust company under the provisions of the trust agreement of April 30, 1908, and shown in Exhibit E to the original bill herein.

Since the entry of the decree herein of March 14, 1914, it has been shown that after the date of the court's opinion, and prior to that of the decree, the Hocking Valley and the Chesapeake & Ohio Railway Companies determined to take appropriate action, under the consolidated mortgage and the trust agreement before mentioned, "to effect the sale under said instruments of all interests in coal properties covered thereby, including stock of the Sunday Creek Company, and the stock of companies the property of which was owned, leased, or controlled by said Sunday Creek Company." And on April 16, 1914, action was taken by the parties interested, including Central Trust Company of New York, as trustee, whereby the value of the Buckeye stock was fixed at not more than $18 a share, and the value of the Ohio stock at nothing. Although the Hocking Valley, by resolution of March 18, 1915, requested Central Trust Company of New York, as trustee, "to cause an appraisal to be made of the value of the first mortgage bonds of the Ohio Land & Railway Company pledged under said first consolidated mortgage," such appraisal did not appear to have been made when approval of this court was first sought of the sale of the capital stock of the Buckeye and Ohio Companies, and the bonds of the latter under the proposed contract before pointed out, yet, as will appear later herein, the trust company has in fact caused appraisal to be made of the lands securing such bonds.

(2) October 9, 1915, the United States filed herein a petition seeking to enforce sale of the respective interests of the Hocking Valley and the Toledo & Ohio Central in the capital stock of coal companies and certain bonds held in one of the companies, as follows:

(a) As to the Hocking Valley: 2,495 shares in the Buckeye Coal Company and 1,999 shares of the Ohio Land Company—all comprised within the stocks above referred to, though the bonds of the latter company are omitted; the entire issue of capital stock in the Boston Coal Dock & Wharf Company, 2,000 shares, and in the Raybould Coal Co., 358 shares; and $190,000, par value, of bonds issued by the Kanawha & Hocking Coal & Coke Company, a defendant herein.

(b) As to the Toledo & Ohio Central: All the capital stock, $300,-000 face value, in the Imperial Coal Company, and $160,000, face value, in the National Coal Company.

(3) October 23, 1915, the Hocking Valley and the Toledo & Ohio Central each filed answer to the foregoing petition, and on October 22, 1915, the Central Trust Company of New York, as trustee under the Hocking Valley first consolidated mortgage, and as trustee under the agreement of April 30, 1908, filed answer to such petition; but analysis of the petition and these answers, and the unsatisfactory character of the evidence which has been offered under these pleadings in the form of stipulations and an affidavit of Charles W. Adams (valid ob-

jection, we think, being made to the introduction of the latter), satisfy us that further consideration of the subjects of the petition (except as to the stocks of the Buckeye and the Ohio Companies and also the bonds of the latter company) should be postponed as stated in the order below.

However, it appears in such answer of Central Trust Company, and is without denial, that 2,495 shares of stock in the Buckeye Company and 2,601 (not 1,999) shares in the Ohio Company are held in pledge by the Central Trust Company as trustee under the Hocking first consolidated mortgage, and certificates therefor stand in its name as trustee; that all rights, title, and interest of the Hocking Valley in and to the equity of such shares, subject to their pledge as stated, were sold, assigned, and transferred to such trustee, as trustee under the agreement of April 30, 1908; that it now holds, among other securities not needing present mention, $1,337,000, face value, of the first mortgage bonds of the Ohio Company in pledge under the Hocking Valley first consolidated mortgage; that, of the $20,000,000 bonds authorized by that mortgage, it has authenticated and delivered $16,156,000, face value, of which $130,000 have been retired by operation of the sinking fund provided for in the mortgage.

(4) On the date the government filed its last petition, October 9, 1915, an affidavit of Carl Remington was introduced without objection, which in the following respects, is not disputed: That Remington has been secretary of the Chesapeake & Ohio and the Hocking Valley since April 1, 1913, and prior thereto was assistant to the chairman of the board of both companies; that after adoption of the resolution of the Hocking Valley, before referred to, in respect to appraisement of the Ohio Company's bonds, "an appraisal was accordingly made by Mr. Tracy W. Guthrie, appointing [appointed] for that purpose by the trustee, which fixed the value of the properties of the Ohio Company securing said bonds at $561,500"; and that certain changes had been proposed by the parties concerned respecting the modifications before referred to as having been stated in our opinion of July 30, 1915, disapproving the contract reported on the 26th of that month, which proposed changes appear in an exhibit to such affidavit. Thereafter, October 15, 1915, an order of the court was entered, disapproving the proposed contract in its modified, as well as in its original, form.

(5) It now appears that the mortgage bonds in question of the Ohio Land & Railway Company matured January 1, 1914, more than two months prior to the entering of the decree herein of March 14, 1914. One of the principal objections to approval of the proposed contract of sale of such bonds and the accompanying stocks was that the plan of the contract would expose a substantial portion of the property, to wit, that covered by the mortgage of the Ohio Land Company, held under lease by the defendant Sunday Creek Company (now Sunday Creek Coal Company), to foreclosure and sale, and this condition remains, and, regardless of their merits, differences have arisen between the Buckeye and the Ohio Land Companies, on the one hand, and the Sunday Creek Coal Company, on the other. These conditions satisfy the court that such interests as the Hocking Valley and the Chesapeake & Ohio (as the holder of the majority interest in the capital stock of

the Hocking Valley) have in the stock of the Buckeye and the Ohio Companies, as also in the bonds of the latter company, substantially interfere with and obstruct the execution and operation of the decree of March 14, 1914.

[1] Wherefore, in view of such decree and the findings made in connection therewith, including the orders of injunction contained in the decree, concerning the combination there found and declared to exist, which included that of the railroad and coal interests, and in pursuance of the jurisdiction then retained "for the purpose of making such other and further orders and decrees as may be necessary to the due execution of this decree and the complete dissolution of the combination and monopoly herein condemned," [1] it is adjudged and ordered, as follows:

(a) The equity and interests of the Hocking Valley Railway Company and the Chesapeake & Ohio Railway Company in and to the cer-

---

[1] We cannot assent to the claims of counsel that the jurisdiction so retained has been exhausted. We are not called upon to determine whether the decree was final in the sense that an appeal would lie to the Supreme Court. Applications made in that behalf, it is true, were approved. We are convinced, however, that the jurisdiction thus retained continues and will continue until the combination and monopoly condemned by the decree have been completely dissolved, so far, at least, as concerns the matters here under consideration. True, also, it was supposed, at the time the decree was entered, that the sale of the stock in the Sunday Creek Company would, so far as the union of coal and railroad interests was concerned, effectually break up the combination so offending against the acts of Congress. But, since this could not be known with certainty, the retained jurisdiction was couched in language that would seem to be distinctly appropriate to the present conditions. The jurisdiction retained was for the purpose of making, not only such further orders and decrees as might be necessary to the due execution of the decree, but also to the complete dissolution of the combination and monopoly therein condemned. It certainly cannot be successfully denied that jurisdiction of such a case as this may and ought to be retained until the decree is fully and effectively enforced, and the condemned monopoly and combination completely dissolved. And as respects the power to retain jurisdiction, see Wabash Railroad v. Adelbert College, 208 U. S. 38, 52 to 57, 28 Sup. Ct. 182, 52 L. Ed. 379. The practice is general in such cases as this to retain jurisdiction in one form or other until the offending conditions can be fully ascertained and removed. Standard Oil Co. v. United States, 221 U. S. at page 82, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734; United States v. American Tobacco Co. (C. C.) 191 Fed. 371, 4 Fed. Anti-Trust Dec. 246, 251; United States v. Eastman Kodak Co. (D. C.) 226 Fed. 62, 81; United States v. Reading Co. (D. C., three judges sitting) 226 Fed. 229, 286; United States v. United States Steel Corporation (D. C., four judges sitting) 223 Fed. at pages 55, 161, 178, 179. And in United States v. Union Pacific R. R. Co. et al., Pamph. 19, 20 (D. C., three judges sitting), it was provided in the last section of the decree: "And jurisdiction is retained for the purpose of giving full effect to this decree and the decree herein entered on February 12, 1913, and for the purpose of making such other and further orders and decrees or taking such other action, if any, as may become necessary or appropriate to carry out and enforce said decrees and the directions of the Supreme Court." Absence of power so to retain jurisdiction, or failure fairly to interpret the power reserved, would entitle the offending parties either to immunity under the doctrine of res adjudicata or subject them to new and distinct litigation for continuing or repeating offenses denounced in the original suit; the former cannot be the true intention, and the latter could serve no useful purpose differing from that sought to be accomplished under the jurisdiction retained.

tain capital stock, to wit, 2,500 shares in the Buckeye Coal & Railway Company, 2,006 shares in the Ohio Land & Railway Company, and $1,377,000 face value of the first mortgage bonds of the latter company, shall be disposed of by absolute sale, and the Central Trust Company of New York, as trustee under the first consolidated mortgage of the Hocking Valley, and as trustee under the contract of April 30, 1908, shall, upon the conditions hereinbelow stated, release all claim, as trustee and as pledgee of such shares of stock and such bonds, and of each of them, upon receipt or tender of the proceeds derived from the sale or sales of such stocks and bonds respectively: Provided, that in every instance such proceeds of sale shall be received and applied by such trustee under and according to the provisions of article 7 of the first consolidated mortgage of the Hocking Valley to such trust company, bearing date March 1, 1899.

[2-4] Should the Central Trust Company fail seasonably or refuse to release such stocks or bonds, or both, by proper delivery of the certificates representing the stocks or of the bonds mentioned, then and in any such event sale or sales will be made under appropriate orders of the court. The sales and releases of stocks and bonds thus provided for shall be made free from every interest or claim of each of such railway companies and their respective stockholders and also of the Central Trust Company in both of its capacities as trustee.[2]

For the purpose of enabling said railway companies and said trustee to comply with this order respecting the sale and release of such stocks and bonds, they shall have three months from the entry hereof so to comply herewith, and if said railway companies and said trustee are

---

[2] We cannot think the insistence of the Central Trust Company well founded that it is not amenable to judicial process or order requiring the company to exercise its powers to cause release to be made of the stocks and bonds in question under conditions such as those above stated, for it seems to be conceded that it is vested with power so to act on the pledgor's request, and whatever discretion it may have in such instances is certainly not one of an unreasonable or arbitrary character. And as regards its rights and duties under the trust agreement of April 30, 1908—the one made in view of the commodities clause of the Hepburn Act Comp. St. § 8563 et seq.)—whereby the Hocking Valley in terms sold and assigned to such trust company all the railway company's interest in the stocks now in question in trust for certain specified purposes (subject, however, to the lien of the first consolidated mortgage, and the trust company's rights as pledgee and trustee thereunder), among which was, in the event of the Supreme Court holding such clause to be constitutional, that the trustee should dispose of the equity in the coal stock "when and as directed in writing by the persons, firms, or corporations holding and owning of record a majority in amount of the stock of the Hocking Valley," etc. (see Exhibit E. to bill of complaint herein), we are convinced that this provision is opposed to the ruling in United States v. Union Pacific R. Co., 226 U. S. 470, 475, 33 Sup. Ct. 162, 57 L. Ed. 306. Our conclusion in this respect derives support from the fact that the Chesapeake & Ohio Railway Company holds and controls a majority of the stock in the Hocking Valley, and so even according to the terms of the instrument is in a position to dominate the Buckeye and Ohio Land Companies. United States v. Del., Lack. & West. R., 238 U. S. 516, 530, 535, 536, 35 Sup. Ct. 873, 59 L. Ed. 1438.

We regard as clear the power of the court to compel the bonds and stocks to be sold free from the lien of the consolidated mortgage, substituting therefor in the hands of the mortgage trustee the proceeds of such sale. One who takes a mortgage upon several items of property of such character that their

able to dispose of such stocks and bonds as herein directed, they shall be and hereby are authorized and empowered so to do;. but, before concluding such sale, said companies shall report to this court the manner of their compliance with this order, the name of the proposed purchaser, bringing him into court for examination, and the said sale and all proceedings looking to compliance with this order shall be subject to approval, rejection or modification by the court.

If within said period said companies do not so comply with this order, then the court will (unless for good cause shown it shall grant further time) otherwise provide for the sale of such stocks and bonds by such action as may be deemed necessary and adequate to such purpose, either through appointment of a master to make such sale, or of a receiver to take possession of such stocks and bonds, with the power to sell and dispose of the same, or in such other manner as will enforce compliance with this order: Provided, however, that if said railway companies and said trustee should conclude to dispose of such stocks and bonds under the contract in that behalf, which was heretofore presented to the court as above stated, with the modifications thereof which were set out·in an opinion of this court of July 30, 1915, whether the proposed purchaser be the same as the person then offered, or some other person or some company satisfactory to the court, such plan will be received and such action thereon taken as shall seem to the court fit and proper; but, if such a course as this be adopted, it shall not be treated as extending time above stated for effecting the sale as ordered.

(b) In view of the state of the evidence respecting the sale of stocks and bonds mentioned in the last petition of the United States, other

---

common ownership or operation may offend against the Anti-Trust Law or the commodities clause, and such that the mortgage serves practically to aid in tying them together, must be deemed to hold his mortgage subject to the contingency that if the complete and final separation of one item of the mortgaged property from the remainder becomes essential to the due enforcement of either named law, the court charged with such enforcement may take control of that item, free it from the consolidating tendency of the mortgage, and substitute therefor its judicially ascertained equivalent. Otherwise the mortgage will stand as the ready means of restoring—or at least tending to restore—those conditions which the court is endeavoring to destroy. It may well be true that a railroad and a coal company under common ownership and management are worth more as security under a mortgage than when independent, and that their effective separation does impair the mortgage security; but this cannot make the law helpless.

If the power exists to direct a sale free from lien, the conditions here found make appropriate the exercise of that power. The consolidated mortgage was given by a railroad and a coal company; it challenged attention to those features which carried potential violation of laws already passed or which might be passed; and the values of these pledged stocks and bonds, having nothing except lands to give them value, can be determined with such substantial accuracy that there is little danger of a mistake seriously prejudicial to the mortgages. We would have no confidence that a sale of the mere equity of the Hocking in these stocks and bonds would bring more than temporary independence. The purchaser could not free them from the overwhelming mortgage nor compel its foreclosure, but the danger of foreclosure and the consequent wiping out of this equity would be constant. The influence, if not the practical domination, of the railroad mortgagor, upon whom the purchaser must rely to prevent foreclosure, could not be escaped.

than the particular stocks and bonds above ordered to be sold, and of the absence of any showing of immediate necessity to pass upon the questions so involved, further consideration of those matters will be postponed; but any of the parties concerned shall have the right to take further evidence within a reasonable time and again to present the subjects, not herein distinctly passed upon, for the consideration and decision of the court.