**BUCK GLASS CO., a Maryland Corporation v. HOFFERBERT, U. S. Collector of Internal Revenue.**

No. 5879.

United States Court of Appeals, Fourth Circuit.

Argued June 16, 1949.

Decided July 27, 1949.

---

1 See the dissent of Mr. Justice Brewer in the Ju Toy case and that of Judge Frank in the Medeiros case.

Walter H. Buck and Eben F. Perkins, Baltimore, Md., for appellant.

Leland T. Atherton, Sp. Asst. to Atty. Gen. (Theron Lamar Caudle, Asst. Atty. Gen., Ellis N. Slack, Sp. Asst. to Atty. Gen., Bernard J. Flynn, U. S. Atty. and James S. Morrow, Jr., Asst. U. S. Atty., Baltimore, Md., on the brief), for appellee.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from a judgment of the United States District Court for the District of Maryland dismissing the complaint of the taxpayer, Buck Glass Company, in an action to recover money alleged to have been improperly collected as federal income tax for the year 1945. The facts, which are not in dispute, may be briefly summarized.

The Buck Glass Company (hereinafter referred to as Taxpayer) was for many years a lessee and licensee of the Hartford-Empire Company, a patent owning, leasing and servicing corporation with a research and technical development department. Pursuant to contract, Taxpayer paid to Hartford-Empire the agreed rentals and royalties.

In 1939, the Federal Government instituted in the United States District Court for the Northern District of Ohio an anti-trust proceeding in which Hartford-Empire and certain other defendants, not here involved, were ultimately held to have violated the federal anti-trust laws. United States v. Hartford-Empire Co., 46 F.Supp. 541. In that proceeding, on August 25, 1942, the District Judge appointed a receiver for Hartford-Empire and directed that the royalty payments due from the various licensees under their contracts with Hartford-Empire be made to the receiver. These funds were to be set aside by the receiver, earmarked as coming from each particular licensee and, upon confirmation of the decree by the Supreme Court, were to be returned without interest to the respective licensees.

Under the terms of this order of the District Judge, Taxpayer, during 1942, 1943, 1944 and 1945, made rental and royalty payments to the receiver in amounts totalling $105,943.81. In its income tax return for each of these years, Taxpayer deducted as operating expenses the payments thus made during the particular year and these deductions were duly allowed.

Upon appeal taken by the defendants in the anti-trust proceeding, the United States Supreme Court affirmed the judgment of the District Court to the extent of finding violations of the anti-trust laws but modified the District Court's decree in many respects. Concerning the royalty funds in the hands of the receiver, the Supreme Court stated, Hartford-Empire Co. v. United States, 323 U.S. 386, 411, 65 S.Ct. 373, 386, 89 L.Ed. 322:

"The receivership should be wound up and the business returned to Hartford. The royalties paid to the receiver by Hartford's lessees may, unless the District Court finds that Hartford has, since the entry of the receivership decree, violated the anti-trust laws, or acted contrary to the terms of the final decree as modified by this opinion, be paid over to Hartford. In any event Hartford should receive out of these royalties compensation on a quantum meruit basis, for services rendered to lessees."

Upon petition of the Government for clarification of the Supreme Court's opinion, that Court in a second opinion stated, 324 U.S. 570, 572, 65 S.Ct. 815, 817, 89 L.Ed. 1198:

"The Government points out that had it not been for the receivership, many of the licensees (most of whom were not parties

to the proceeding) would have paid no further royalties to Hartford, and that they may be able to justify refusal of payment of any royalties from the date of the receivership, and ought not to be put in the position of recovering royalties paid to the receiver, from Hartford.

"It has been open to each of these licensees at any time to repudiate its lease and license, to return the leased machinery, to refuse to pay further rentals or royalties, and to defend any suit arising out of such refusal to pay, either for infringement or otherwise. It may be that licensees have not taken this course because they relied on the decree as entered by the District Court. In such reliance they may have expected that the moneys paid the receiver would be repaid to them.

"In view of the modifications required by the opinion of this court, such licensees must pay reasonable rental and service charges on a quantum meruit basis, (leaving out of consideration any amount otherwise payable for the privilege of practicing the patented inventions involved) in respect of the machines used in the interim. Unless Hartford, since the entry of the decree by the District Court, has been guilty of some added violation of the anti-trust laws, licensees must elect (a) to remain licensees on such reasonable rental and royalty basis for the future as the District Court may fix, or (b) repudiate the leases and litigate their rights as against Hartford to retain any portion of the rents and royalties paid. Depending upon such election of each of the lessees, the District Court may, on the application of each, make an appropriate order for the disposition of the fund in the light of the licensees' election and the principles stated in the opinion of this court."

Following the second opinion of the Supreme Court, and prior to entry of final judgment by the Ohio District Court, Taxpayer and other non-defendant licensees of Hartford-Empire intervened in the anti-trust proceeding.

As suggested by the Supreme Court's second opinion, a division had developed among the various licensees of Hartford-Empire. Many of them, including Taxpayer, were comparatively small glass-making concerns, and needed, especially, the research and technical development services of Hartford-Empire in order successfully to compete with larger companies having their own such departments. Licensees in this class were primarily interested in seeing that Hartford-Empire was maintained in a condition which would enable it to supply them with these services and it was to this end that their intervention in the anti-trust proceeding was largely directed. Many of them, however, had claims of various kinds against Hartford-Empire, which was unwilling to conclude any agreement until those who wished to remain as licensees executed covenants not to sue Hartford-Empire for past transactions of any kind. Others of the licensees desired to repudiate their contracts with Hartford-Empire and litigate any claims they had against it.

In addition, since Hartford-Empire was not to be dissolved as a result of the anti-trust proceedings, the opinion of the Supreme Court required that the District Court upon remand fix reasonable rental and royalty rates for Hartford-Empire to charge in the future. Due to the difficulty of fixing these rates and the complexity of the problems suggested, a committee of those who wished to remain as licensees in the future was appointed to negotiate with representatives of Hartford-Empire. After numerous conferences, an agreement was finally concluded embodying the following provisions: (1) reasonable rentals and royalties for the future were agreed upon; (2) those who wished to remain licensees of Hartford-Empire in the future executed covenants not to sue Hartford-Empire for any transactions occurring between April 11, 1912, and November 1, 1945; (3) Hartford-Empire agreed to pay to each licensee who executed the above covenant an amount equal to 60% of the sums paid to the receiver by such licensee during the period September 1, 1942, through October 31, 1945. This agreement was ultimately approved by the District Court and embodied in its final decree.

In line with this portion of the decree of the District Court, Taxpayer herein executed the covenant not to sue and, in 1945, was paid by the receiver of Hartford-Empire the sum of $61,914.12, i. e., an amount equal to 60% of the amount the Taxpayer had paid to the receiver by virtue of the District Court's order of August 25, 1942, less Taxpayer's pro rata share of the expenses of the committee of licensees.

Taxpayer included this $61,914.12 in its gross income for 1945, paid under protest the tax based thereon, and instituted in the Court below this action for recovery of the taxes thus paid. The District Judge, below, held that this item was properly included as part of Taxpayer's gross income for 1945 for income tax purposes, and dismissed Taxpayer's complaint. The correctness of his ruling is the only question presented by this appeal. We think this ruling was clearly correct.

■■ This case is governed by the well-established principle that where a taxpayer recovers all or a part of amounts expended in prior years and deducted in computing federal income tax for those prior years, the amount so recovered is taxable as income in the year of recovery. Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S. Ct. 150, 75 L.Ed. 383. Taxpayer, here, reduced its taxable income for the years 1942 through 1945 by virtue of the deductions properly taken for the rental and royalty payments made by Taxpayer to the receiver. When, in 1945, Taxpayer recovered a portion of the amounts so paid, the recovery represented a replacement to Taxpayer, to that extent, of taxable income. See Harwick v. Commissioner, 8 Cir., 133 F.2d 732, 735-737, affirmed 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248; Commissioner of Internal Revenue v. United States & International Securities Corp., 3 Cir., 130 F.2d 894; Helvering v. State-Planters Bank & Trust Co., 4 Cir., 130 F.2d 44, 46, 143 A. L.R. 333.

Citation of additional authority for this general proposition is unnecessary. Taxpayer's argument goes to the heart of the problem, here, when it asserts that the payments made by Taxpayer lost their identity in the hands of the receiver, and that the receipt of the $61,914.12 by Taxpayer from the receiver was by virtue of an agreement made at arms' length between the committee of licensees and representatives of Hartford-Empire and bore no relation to the rental and royalty payments previously made by Taxpayer to the receiver. In other words, it is Taxpayer's position, repeatedly stated throughout its brief, simply that the $61,914.12 paid to it from the impounded funds was *not* a return of the rental and royalty payments. The facts, however, disprove any such assertion.

As has been already noted, the funds held by the receiver were set aside and earmarked as having been paid in by each individual licensee. And the District Judge in Ohio, in his final decree, directed the receiver to return to the Taxpayer 60% of the funds held in its name, less certain minor expense items. As was pointed out in the opinion of the Judge below, had not Taxpayer and the other licensees continued the royalty payments to the receiver, there would have been no fund for distribution. It is impossible to speculate what would have been the agreement, in that event, reached between Hartford-Empire and the committee of licensees. The agreement actually concluded, however, did in fact provide for a return to Taxpayer of 60% of the funds held by the receiver in its name. Nor is that fact altered by the language of the agreement, embodied in the judgment, to the effect that each licensee was to receive "a sum equal to" 60% of the funds earmarked as coming from it.

Taxpayer lays great stress upon its assertion that the District Judge in Ohio had no power to order the impounded funds returned to the licensees and did not attempt to exercise any such power other than by way of approving the agreement voluntarily entered into by the licensees and Hartford-Empire. In support of this position, Taxpayer relies principally on the portions of the Supreme Court's opinions quoted above. Thus Taxpayer argues (1) that the District Judge's power to fix reasonable rental and royalty rates related only to the

future and that he had no authority with respect to rentals and royalties paid under the old contracts; (2) that the suggestion that Hartford-Empire, as to the past, was entitled only to rental and service charges on a quantum meruit basis related only to those licensees who desired to repudiate their contracts with Hartford-Empire and litigate their claims against it; and (3) that Hartford-Empire had a legal right to the impounded funds as against those licensees who elected to remain as licensees.

A careful reading of the Supreme Court's opinions does suggest an omission (as pointed out by Mr. Justice Rutledge in a dissenting opinion, 324 U.S. 575, 580, 65 S. Ct. 815, 89 L.Ed. 1198) of any specific provision for repayment of any portion of the impounded funds to those licensees who continued as such. For the purposes of this case, however, we may readily concede, as Taxpayer asserts, that Hartford-Empire had an absolute right, as against Taxpayer, to the funds. Such a concession indicates only that Taxpayer did not recover the payments made *as a matter of right,* which does not in itself, and in the light of the governing principle here, affect the taxability of the amount of the recovery.

Taxpayer points out, also, that it in fact had no claim against Hartford-Empire and therefore, in executing the covenant not to sue, gave no consideration for the 60% payment to it. We are unable to see the significance of this unless, perhaps, there is implicit a suggestion that the payment to Taxpayer was a gift from Hartford-Empire. The District Judge, however, properly ruled that in no view of these facts could this payment be classed as a gift, and we do not, in fact, understand that Taxpayer seriously makes this contention.

Finally, Taxpayer cites the usual definition of income ("gain derived from capital, from labor, or from both combined * * * [or] profit gained through a sale or conversion of capital assets"—see Eisner v. Macomber, 252 U.S. 189, 207, 40 S. Ct. 189, 193, 64 L.Ed. 521, 9 A.L.R. 1570) and insists that this payment to it is not within the definition. The difficulty with this and the other arguments of Taxpayer is that they completely ignore the underlying principle which we have already set out as controlling this case. As has been pointed out, Taxpayer paid the rentals and royalties during 1942 through 1945 out of its earnings and profits for those years and, because of the deductions thus allowed, those payments represented a portion of Taxpayer's income in those years which was not then taxed. When, in 1945, a portion of the amount so disbursed out of earnings was returned to Taxpayer, that return was a replacement to it of income not previously taxed but which then became taxable. This is true whether the payments came to Taxpayer as a matter of right, as the result of magnanimity on the part of Hartford-Empire in returning payments to which it had a legal right but which it recognized as excessive, or for any other reason suggested by the facts of this case. We think, accordingly, that these repayments to Taxpayer fall clearly into the category of taxable income.

The judgment of the District Court is affirmed.

Affirmed.